IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

**STATE OF TENNESSEE v. STEPHEN DOUGLAS SMITH**

**Appeal from the Circuit Court for Marshall County**
**No. 2013-CR-135, 2013-CR-136  Franklin L. Russell, Judge**

_____

**No. M2017-00216-CCA-R3-CD**

_____

The Defendant-Appellant, Stephen Douglas Smith, was convicted by a Marshall County jury of one count of rape of a child, four counts of aggravated statutory rape, and forty counts of especially aggravated sexual exploitation of a minor, for which he received an effective sentence of forty-one years.  T.C.A. §§ 39-13-522, -506; 39-17-1005.  On appeal, the Defendant argues that:  (1) the evidence was insufficient to support his convictions; (2) the trial court improperly admitted a thumb drive and the photographs from it into evidence; and (3) the trial court erred in denying his motion to cross examine the victim regarding her sexual history.[1]  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Daniel Lyn Graves II, Murfreesboro, Tennessee, for the appellant, Stephen Douglas Smith.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Robert J. Carter, District Attorney General; and Eddie Barnard and Hollynn Eubanks, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

_____

[1] These are not the issues proscribed in the Defendant's issues presented section of his brief.  For reasons which we will explain below, these are the issues we discern from the corresponding argument section of his brief.

From May 2008 to November 2011, the Defendant forced the minor victim, E.I.[2], to engage in various sexual acts, including sexual intercourse, digital penetration, and oral sex, and took over forty sexually explicit photographs of the victim during these activities. After finding these explicit photographs hidden on a computer gifted by the Defendant, Amy and Samuel Hood copied the photographs onto a SanDisk thumb drive and provided the thumb drive and their computer hard drive to the police. The police then executed a search warrant on the Defendant's home and seized the Defendant's computer, the Defendant's red Ultra thumb drive, and other relevant evidence. A comparison of the photographs on the Defendant's thumb drive revealed forty sexually explicit photographs of the victim, taken with the Defendant's Fujifilm camera. Based on this evidence, the Defendant was indicted for the aforementioned offenses. The following evidence was adduced at trial.

**Trial.** The victim testified that she and her family lived with the Defendant and his wife, Heather Smith,[3] in Cornersville, Tennessee, where the instant crimes took place, from approximately January to November 2008. The victim called the Defendant and his wife "aunt and uncle" and explained that "[t]hey were really close family friends." The victim explained that the Defendant and his wife maintained separate bedrooms and that the Defendant's job included working on computers from home. The victim and her family moved out in late 2008 but maintained contact with the Defendant and his wife and stayed at the Defendant's house while the victim's mother was at work, on weekends and holidays. She later met Amy Hood who moved into the Defendant's house after the victim and her family moved out. Once Amy Hood moved in, the victim explained the Defendant moved his bedroom/office into the garage and the Defendant flipped the deadbolt lock on the door so that a key was required to enter. The Defendant later placed a keypad lock on his bedroom door. The victim recalled the Defendant and Amy Hood fighting before Hood moved out of the Defendant's house.

Before the sexual abuse began, the victim recalled sleeping in the Defendant's bed while she was sick and that the Defendant "said that during the night I had grabbed [his penis], I grabbed him and had hurt him and that I had my hand in my pants like I knew what I was doing." She confirmed that she did not remember that happening. The victim testified that she was twelve years old when the Defendant's sexual abuse began in the summer of 2008. The first sexual encounter occurred in May or June 2008 at the Defendant's house in his locked bedroom when the Defendant told the victim to remove

---

[2] It is the policy of this court to refer to minor victims and their family members by their initials.

[3] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. and Mrs. or by his or her proper title.

her clothes and get into his bed. She said the Defendant "was like rubbing his penis on my butt and then he said [his penis] accidentally went in" her vagina, "did a few thrusts and then didn't finish." She confirmed that the Defendant also digitally penetrated her vagina. The victim then identified three sets of photographs each taken on different dates at her mother's house and in the Defendant's bedroom. She explained that the Defendant photographed her naked while he forced her to engage in sexual intercourse, digital penetration, and oral sex. She testified that the Defendant took these photographs "to have something on me" and to keep her from telling the police. She identified the male in the photographs as the Defendant, specifically identifying his naked body parts, wedding ring, gold watch, and blue plaid pajama pants. She identified the photographs taken in her mother's house by the wallpaper and orange shag carpet in her mother's bedroom and the photographs taken in the Defendant's house by the bedspread and mini-fridge in the Defendant's bedroom. The final sexual encounter occurred on the victim's sixteenth birthday weekend in November 2012 when the Defendant said that his "birthday present" to her was to have sex one last time and then "he would stop." The Defendant forced the victim to perform oral sex on him while he digitally penetrated her and then forced her to engage in sexual intercourse. The victim confirmed that the Defendant did not use a condom during these encounters.

The victim identified the Defendant's Fujifilm digital camera that he used to photograph her and then gifted to her for Christmas in 2011. When the camera belonged to the Defendant, the victim said he kept it in his desk drawer and no one was allowed to use it without the Defendant's permission and that it could not be taken away from the house. Asked whether she ever downloaded photographs from her Fujifilm camera to the Defendant's computer, the victim stated, "I'm sure there was a time when I did." The victim gave the Fujifilm camera and her jewelry and clothing visible in the "sex pictures" to the Tennessee Bureau of Investigations ("TBI") once the instant investigation began. On cross-examination, the victim testified that the sexual encounters occurred when her brothers were asleep and her mother was at work. She explained that she and her brothers were not allowed in the Defendant's bedroom or on his computer without his permission and presence. She confirmed that the Defendant "had a brain tumor, which led to other problems like [he] wasn't very strong" and that he was in a wheelchair for some time after she and her family moved out of the Defendant's house. She said she went on a week-long work trip with the Defendant and his friend, Bruce Short, and confirmed that no sexual encounters happened on that trip. Asked why she did not tell anyone about the sexual encounters before she talked with the police, the victim stated, "[n]o one tells you to tell people if it's a family member that touches you[,]" and "I wanted to tell, but there, I mean, by the time the secret had gotten so big and I realized what was happening was not normal, I didn't say anything, because by then the pictures had been taken and there wasn't much else I could do."

Amy Hood testified that she lived with the Defendant and his wife from April 2009 to February 2012 and met the victim and her family after Hood moved in. She said no one in the house was allowed in the Defendant's bedroom or to use his computers or cameras without his permission or presence. She confirmed that the Defendant converted the garage to his bedroom after September 2009, "flipped" the deadbolt lock so that "he could lock it from the garage side[,]" and later installed a keypad lock on his bedroom door. She testified the Defendant gifted her his self-built desktop computer ("Hood computer") in 2011, which she then password protected. The Defendant told her "he had erased the entire hard drive, reinstalled the operating system, so that it was essential[ly] a new computer without any of his stuff on there." She said "[t]he [Fujifilm] camera never left [the Defendant]'s desk" and that "it never left his room" while it was being used. She recalled the Defendant gifting the Fujifilm camera to the victim for Christmas. She explained that the Defendant spent a lot of time with the victim and gave her lots of gifts; she said she "found it very odd." She said the victim and her brothers visited the Defendant's house weekly while the victim's mother was at work. She recalled several times in "the winter of 2009" and throughout 2011 that she could hear the victim alone with the Defendant in his bedroom "anywhere from 11:00 at night to 3:00 in the morning." She said she had "[a] nagging suspicion that something was going on. You know, something wasn't right[.]"

Amy Hood also lived with Sharon and Bruce Short from February 2012 "off and on until October," and in April 2013, she said the Defendant kicked her and her children out of his house and called the police on them. She explained there was some animosity between the Defendant and her husband, Samuel Hood, because "[Samuel] Hood felt that [the Defendant] was controlling [Amy Hood's] life" and that the two men had "quite a few verbal altercations." During the move, she left the Hood computer at the Defendant's house and returned two weeks later to retrieve it. Shortly thereafter, Samuel Hood began installing video games on the computer when he "said that [the computer] was running really slow" and Amy Hood responded that she "didn't understand why, because [she] didn't have a lot of stuff on the computer." Samuel Hood began deleting old files and discovered that someone performed "a dirty install . . . that somebody didn't erase the hard drive fully before reinstalling the operating system." The next day, Amy Hood resumed investigating the computer when she found explicit photographs of the naked victim. She and Samuel Hood then copied the explicit photographs onto a SanDisk thumb drive and deleted them from the computer. A few days later, they delivered the computer's hard drive ("Hood hard drive") and the SanDisk thumb drive to the Cornersville police. The Hoods then spoke with TBI Special Agent Andrew Kon and signed consent forms to search the contents of the Hood hard drive and SanDisk thumb drive. Amy Hood confirmed that she did not change the dates of the transferred files and identified her signature on the police consent form. At trial, Amy Hood identified the victim in the photographs by her face and the bracelets she wore; identified the Defendant

- 4 -

by his gold wedding ring, watch, and pinky finger; and identified the location of some of the photographs as the Defendant's bedroom, noting the garage door, the Defendant's mini-fridge, and the blanket on his bed. She confirmed that the explicit photographs were taken before she received the Hood computer from the Defendant and noted that the photographs were taken by the Defendant's Fujifilm camera.

Samuel Hood testified consistently with Amy Hood's recollection of events. In addition, he stated that after Amy Hood brought the Hood computer home, he noticed it "was running really slow" and decided "to format it" or clear space on it. He determined that someone performed "a dirty install, which basically means that [the Defendant] had installed Windows on top of Windows without formatting beforehand." He identified the victim in the photographs by her face, identified the Defendant "by his thumb nail[,]" and recognized the Defendant's mini-fridge in the background. He said Amy Hood was "freaked out" and "[s]hocked, [in] disbelief, emotional" after seeing the explicit photographs. He confirmed that they transferred the photographs to a SanDisk thumb drive without altering the photographs. On cross-examination, Samuel Hood confirmed that he and the Defendant initially had a friendly relationship, but over time they began to have arguments because Samuel Hood "felt [the Defendant] was trying to sabotage the relationship" between Amy and Samuel Hood and that the Defendant tried to "control" Amy Hood.

Officer David McVey testified that Amy and Samuel Hood came to the Cornersville Police Department on May 22, 2013, and "report[ed] that they had received a computer [] that had some pornography photos on it of a young lady." The Hoods "explained what was on the [Hood hard drive and SanDisk thumb drive] and g[a]ve the names of the individuals where they obtained the computer." The Hoods also explained to Officer McVey how they obtained the photographs and gave the date and time stamps on the photographs. At trial, Officer McVey identified the SanDisk thumb drive and Hood hard drive and stated that he locked the evidence in the "evidence lock box" at the police station. He then delivered the SanDisk thumb drive and Hood hard drive to TBI Special Agent Andrew Kon. He confirmed that Amy and Samuel Hood signed a consent form allowing them to search the evidence.

TBI Special Agent Andrew Kon testified that he was the lead investigator in this case and identified the SanDisk thumb drive and hard drive given to him by Officer McVey. Agent Kon interviewed Amy and Samuel Hood who explained what they found and how they transferred the photographs from the Hood hard drive to the SanDisk thumb drive. He confirmed they signed a consent form to search the evidence. Agent Kon then packaged and labeled the SanDisk thumb drive and Hood hard drive as evidence and delivered them to the TBI's Technical Services Unit where the evidence was forensically examined. The unit reviewed the items and provided a preliminary

report of the evidence. Agent Kon confirmed that the information given to him from Amy and Samuel Hood was consistent with the TBI's preliminary findings. Agent Kon then obtained and executed a search warrant for the Defendant's house and collected relevant evidence, including the Defendant's gold watch, his red Ultra thumb drive, and his personal computer ("Defendant's computer"). He later obtained the Fujifilm camera from the victim and delivered it to the TBI Technical Services Unit for examination.

TBI Special Agent Nicholas Christian, an expert in digital forensics, testified that he examined the SanDisk thumb drive, the red Ultra thumb drive, the Hood hard drive, the hard drive from the Defendant's computer ("Defendant's hard drive"), and the Fujifilm camera. Through his forensic analysis, he found forty sexually explicit photographs of the victim on the Defendant's red Ultra thumb drive and the Hoods' SanDisk thumb drive and determined that the photographs were taken by the Defendant's Fujifilm camera. He determined that seventeen of the forty photographs were taken on January 14, 2011; twelve photographs were taken on February 4, 2011; and eleven photographs were taken on February 8, 2011. He described hash values as unique identifiers for any image file. He compared the hash values of the photographs on both thumb drives and concluded that thirty-seven of the forty photographs matched each other exactly. Of the remaining three photographs, Agent Christian visually examined them and determined that two were the same but rotated on March 5, 2011, and one was the same but had altered lighting.

Agent Christian explained that the forty photographs on the Defendant's red Ultra thumb drive were contained in a password protected encrypted file that could only be decrypted when connected to the Defendant's computer and hard drive. He determined that the Defendant's red Ultra thumb drive was last connected to the Hood computer and hard drive on September 13, 2011. On November 9, 2012, the Defendant's red Ultra thumb drive was last connected to the Defendant's personal computer and the forty explicit photographs were downloaded and encrypted from the Defendant's computer onto his red Ultra thumb drive. Later that same day, a new operating system was installed onto the Hood computer before the Defendant gave it to Amy Hood. On May 19, 2013, the Hoods' SanDisk thumb drive was last connected to the Hood computer when they downloaded the forty explicit images before delivering it to the police on May 22, 2013.

During his forensic examination, Agent Christian did not find any relevant photographs on the Hood hard drive and explained that "if you delete an image, most of the time, computer forensics can recover that image. But due to the volume of data that was being moved around on the hard drive, it appears to be, that appears to be overwritten." He explained that "if [the explicit photographs] were not there, they were either there and I missed them, overlook[ed] them; they were there and my forensic tool

- 6 -

could not recover them; or they were unrecoverable, because they were overwritten." Agent Christian agreed that the dates in the camera could have been changed, but stated that there was no "evidence to suggest that" the dates on the computers, hard drives, or photographs were altered. He opined that, because Samuel Hood "was deleting and removing a lot of data" while transferring the photographs from the Hood hard drive to the SanDisk thumb drive, that the files were likely overwritten and that is why his forensic tools could not find the photographs during his own investigation.

Heather Smith, the Defendant's wife, testified that she and the Defendant maintained separate bedrooms and that the Defendant had two strokes in 2009 and 2010 causing him to have "problems getting an erection[.]" She said the Defendant's bedroom had a "flimsy lock" on it and that the victim and her family were to ask for permission before entering the Defendant's bedroom. She said the victim and her family lived in her and the Defendant's house from February to November 2008 and that the Defendant had a good relationship with the victim and her two brothers, stating "[t]hey were like adopted niece and nephews[.]" After the victim and her family moved out, she confirmed that the victim and her brothers visited the Defendant's house "off and on" until August 2009 and again during January and February 2011. She stated that she and the Defendant did not go to the victim's house during that time because the Defendant was in a wheelchair and using crutches at the time and, to her knowledge, the Defendant never went to the victim's house by himself. She confirmed that she was not concerned about the victim being alone in the house with the Defendant or traveling alone with him.

Smith said Amy Hood lived with them from April 2009 to April 2013. She said she and the Defendant had problems with Amy Hood while she lived with them and that Samuel Hood and the Defendant had a "[v]ery antagonistic" relationship due to "personality differences." She confirmed that the Defendant gave Amy Hood his computer and the victim his Fujifilm camera in 2011. She specified that, before the camera was given to the victim, "[a]nybody could use the cameras that were in the house [but] they weren't allowed to take them off the premises."

At trial, Smith looked at the explicit photographs in evidence, agreed that the gold watch in the photographs looked like the Defendant's but explained that "[h]e only wore it for probably about two weeks" because the battery stopped working shortly after he started wearing it and that it "was a cheap $5 watch at Wal-Mart." She looked at the gold wedding band in the photographs and stated that "we've never had plain gold bands." She looked at the man's hands in the photographs and stated that it "[d]oesn't look like [the Defendant's] hand to me" because it "doesn't have enough hair on it," "the fingers [] are a little bit too straight for his hand," and "[t]he fingers are too short and stubby." She looked at the man's penis in the photographs and identified several "mole[s] or [] skin tag[s]" on the penis but stated that it was not the Defendant's penis because "the skin tags

that he has and the moles are on the sides and underneath." She also stated that it was not the Defendant's penis because "it's too small" and "[s]ome of the markings that he has are not in the picture." She positively identified the victim in one photograph and recognized the location as the victim's mother's bedroom. Smith also identified four photographs that she took of the Defendant's penis in anticipation of trial and confirmed that she took the photographs after viewing the explicit photographs including the victim. She agreed that the man's penis in the explicit photographs was erect but the Defendant's penis in the photographs she took was flaccid.

Sharon Short, a friend of the Defendant's, testified that she and her son, Bruce Short, visited the Defendant and his wife at least once a month and on holidays. She testified that the Defendant "act[ed] appropriately" toward the victim and her brothers and that she never saw the Defendant and the victim "alone together[.]" Short confirmed that Amy Hood lived with her for approximately a year and did not recall observing any arguments between the Defendant and Amy and Samuel Hood. She said the Defendant had several health issues and that he was in an arm cast and used crutches at different times. She recalled being at the February 2011 Super Bowl party at the Defendant's house that the victim also attended, but did not recall any fights.

Bruce Short, a former friend of the Defendant's, testified that he became friends with the Defendant through work and visited his house often. He said he and the Defendant once traveled to Ohio for work, that the victim joined them, and that they each had their own bed. He confirmed going to the victim's house with the Defendant several times, but said he never saw the Defendant "act inappropriately towards" the victim or her brothers. He said the Defendant had many health issues and recalled the Defendant spending time in a wheelchair and in a boot or cast on his leg but could not recall when. He recalled being at a Super Bowl party at the Defendant's house that the victim also attended and witnessed a fight between the Defendant and Amy Hood's mother. He stated that he observed the Defendant and Amy Hood arguing "[m]any times[,]" but did not witness any arguments between the Defendant and Samuel Hood. He recalled the Defendant gifting Amy Hood a computer, confirmed that she password protected the computer, and stated that he did not have access to her administrator account. He confirmed that the Defendant hung out with the victim alone "[a] fair bit[.]"

Dr. James MacDonald, the Defendant's physician, testified that the Defendant had surgery on his foot in September 2010 and was placed in a cast. Dr. MacDonald examined the Defendant again in November 2010 and April 2011, confirmed that the Defendant continued to have foot pain, but made no note in his records of a cast or boot on the Defendant's foot. He confirmed that the Defendant's wife is his employee.

- 8 -

Officer Michael Gaylon of the Marshall County Sheriff's Office testified that he performed "a welfare check on some individuals that lived at the [Defendant's] house" in "late 2007, early 2008." He did not recall visiting the house on any other occasions or serving any warrants on the Defendant.

Keain Landtroop testified that he and the victim were friends and briefly dated. He met the Defendant through the victim and visited the Defendant's house on several occasions. He said he never saw the Defendant "act inappropriately" toward the victim. He was not sure he knew Samuel Hood, but stated that he observed Amy Hood and "her boyfriend" argue with the Defendant because "[the boyfriend] thought that [the Defendant] was trying to be sexual towards" Amy Hood. He did not recall the Defendant being in a cast or boot but did recall him being in a wheelchair once.

The victim's mother testified that she and her three children lived at the Defendant's house from January 2008 to August or September 2008 and that the Defendant and his wife watched the victim and her brothers while she was at work. She said she and the Defendant had "a falling out" when she moved out of the Defendant's house but the children still visited "occasionally." She confirmed that she was concerned that the Defendant "would favor [the victim] a lot" and treat her differently than her brothers.

The victim's brother testified that he lived with his family at the Defendant's house and that the Defendant and his wife would watch them while their mother was at work. After moving out of the Defendant's house, he confirmed that the children still visited the Defendant's house "[e]very school week." He recalled the Defendant and the victim being alone together and that the Defendant "would sometimes lock the door[.]" He said "they were just talking about something or watching a video. Sometimes I would hear laughing." On one occasion, he said he went into the Defendant's room while he was alone with the victim and that the Defendant "completely chewed [him] out" because "they were talking about something important" and "[i]t's rude to walk into someone's office or space" without permission. He said everyone but the Defendant's wife had to ask permission to enter the Defendant's bedroom. He confirmed the Defendant came to their house several times but did not recall the Defendant being in a wheelchair, a boot, or a cast. He confirmed overhearing the Defendant argue with Amy Hood but not Samuel Hood.

After deliberation, the jury found the Defendant guilty as charged as to all counts in the indictment. On January 8, 2016, the trial court sentenced the Defendant to twenty-five years for the rape of a child conviction; four years for each of the four aggravated statutory rape convictions, to be served consecutively to the rape conviction; and twelve years total for the forty especially aggravated sexual exploitation of a minor convictions,

to be served concurrently with the effective forty-one year sentence.  The Defendant filed a motion for new trial on February 4, 2016, and an amended motion for new trial on December 27, 2016, both of which were denied by the trial court.  It is from these judgments that the Defendant appeals.

## ANALYSIS

We must first address the deficiencies in the Defendant's brief because they substantially hamper our review.  The record shows that defense counsel zealously represented the Defendant at trial, and we do not question the adequacy of his trial representation.  However, in his brief to this court, the Defendant presents four issues: (1) "whether the weight of the evidence in this case is against the verdict as the State failed to prove each element of every count beyond a reasonable doubt;" (2) "whether the interests of justice require the granting of a new trial based on the incomplete and faulty evidence produced at trial, specifically the admissibility of evidence obtained through data devices;" (3) "whether the sufficiency of the evidence is below the required standard required for conviction;" and (4) "whether the Defendant was prevented from having a fair trial because evidence of the alleged victim's prior sexual activity was withheld from the jury."  As pointed out by the State, the Defendant then packs various sub-issues within the argument sections of his brief.  In the corresponding argument section for issue (1), "whether the weight of the evidence in this case is against the verdict as the State failed to prove each element of every count beyond a reasonable doubt," the Defendant randomly touches upon the denial of his motion to suppress (by improper chain of custody and impeachment of the affidavit based on intentional misstatements of the federal agent), the State's alleged failure to file a bill of particulars or elect offenses, and the State's alleged improper closing argument.  In the corresponding argument section for issue (2),"whether the interests of justice require the granting of a new trial based on the incomplete and faulty evidence produced at trial, specifically the admissibility of evidence obtained through data devices," the Defendant claims that the State withheld exculpatory evidence by not providing data from the Hood computer, that was allegedly erased by Samuel Hood, that the State had a duty to preserve such evidence; that the trial court erred in restricting a medical doctor's testimony regarding the Defendant's foot surgery during which he was limited to a wheelchair; that the trial court erred in allowing the jury to continue deliberations "after dinner;" that the State engaged in improper closing argument; that the State elicited an emotional outburst by Amy Summers during trial regarding her deceased child which was prejudicial; and two paragraphs referencing the alleged staleness of the evidence in the affidavit supporting the search warrant.  The brief does not provide citations to the record or supporting authority for the bulk of the sub-issues presented.  Because the Defendant's brief fails to comply with Rule 27 of the Tennessee Rules of Appellate Procedure, and because the Defendant's sub-issues are mostly indiscernible, the State argues they are waived.

Rule 27 of the Tennessee Rules of Appellate Procedure requires parties to include a statement of the issues presented for review in their appellate brief. Tenn. R. App. P. 27(a)(4). "The issues presented for review constitute the backbone of an appeal." See State v. Williams, 914 S.W.2d 940, 947-49 (Tenn. Crim. App. 1995). Moreover, parties should refrain from incorporating several separate and distinct errors into a single issue. Id. (citing Leeson v. Chernau, 734 S.W.2d 634, 637 (Tenn. Ct. App.), perm. app. denied (Tenn.1987)). When an advocate's ability to clearly articulate the position of a client requires that the argument be subdivided into two or more sub-issues, each issue must be directly related and constitute parts of the main issue presented for review. Id. This is important because,

> If an issue is not properly drafted, the attorney preparing the appellant's brief cannot properly research or argue the merits of the issue. The attorney preparing the appellee's brief will entertain doubt as to the precise issue that is to be addressed or will restate the correct issue supported by the record. The judges who must resolve the merits of the issue will not be able to determine the precise issue to be addressed. Thus, properly drafted issues will assist the writer of the appellant's brief, the writer of the appellee's brief, the panel of appellate judges who are assigned the responsibility of addressing the issues in an opinion, and the staff of each appellate judge.

Id. (internal footnote omitted). An issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Rule 27(a)(4). See Mobley v. State, 397 S.W.3d 70, 104 (Tenn. 2013) (citing Hodge v. Craig, 382 S.W.3d 325, 334 (Tenn 2012)).

Here, the State properly pointed out the deficiencies in the Defendant's brief, and the difficulties in responding to it. Although the Defendant filed a reply brief, he did not remedy the errors or clarify the issues. As such, we agree with the State, and conclude that the sub-issues, as we have outlined above, are waived. Waiver notwithstanding, the sub-issues outlined in the Defendant's brief appear to mirror the issues raised in the Defendant's amended motion for new trial, which was rejected by the trial court in a thorough and well-reasoned order. Following our review, we conclude that the record does not preponderate against the findings of the trial court. Accordingly, to the extent that the Defendant raises the same issues articulated in his amended motion for new trial, he is not entitled to relief. We will now review the remaining issues as we discern them from the Defendant's brief.

- 11 -

**I. Sufficiency of the Evidence.[4]**  The Defendant does not appear to challenge his convictions of rape of a child (25-year sentence) or aggravated statutory rape (4-year sentences).  In challenging the evidence supporting his convictions of especially aggravated sexual exploitation of a minor, the Defendant contends that, other than the testimony of Samuel Hood, there is no proof that the explicit photographs "were ever stored, housed or viewed on any device under the exclusive control of [the] Defendant[.]"  The Defendant asserts that, once he erased his computer and gifted it to Amy Hood, she had exclusive control and possession of the computer and any files derived therefrom could not be his.  Moreover, the Defendant asserts that Amy Hood, Samuel Hood, and the victim conspired against him to falsify evidence and convict him of the instant crimes.  The State argues that the evidence is sufficient to show that the Defendant "knowingly promoted a person under the age of 18 to participate in the production of material depicting different acts of sexual activity[,]" that the victim's testimony established the Defendant's identity in the photographs and was corroborated by other witnesses, and that the Defendant was the person who took and stored the explicit photographs.  Upon review, we agree with the State.

In resolving this issue, we apply the following well established standard of review.  The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."  Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).  The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence.  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence."  Henley v. State, 960 S.W.2d. 572, 578-79 (Tenn. 1997).  This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of

---

[4] We combine Defendant's issues one and three and rely upon portions of the corresponding argument sections in his brief.

the prosecution's theory." Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

When the State offers proof of guilt based on circumstantial evidence, the jury decides how much weight to give to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (internal quotation and citation omitted). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)). Here, the Defendant was convicted of forty counts of especially aggravated sexual exploitation of a minor. See T.C.A. §39-17-1005. Especially aggravated sexual exploitation of a minor provides that "[i]t is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." T.C.A. § 39-17-1005(a).

In arguing that the evidence is legally insufficient to support his especially aggravated exploitation of a minor convictions, the Defendant relies upon United States v. Lowe, 795 F.3d 519, 520 (6th Cir. 2015), for the proposition that the State has failed to establish he had exclusive possession of the computers and thumb drives recovered in this case.[5] In that case, the defendant was charged with and convicted of knowingly receiving, distributing, and possessing child pornography in violation of 18 U.S.C. § 2252(a). Between March and August 2011, a user downloaded child pornography to a laptop found in the Defendant's home, which he shared with his wife. A minor relative, described as the Defendant's adopted child lived with the Defendant at some point during 2011 but moved out before agents searched the home in August and retrieved a laptop containing child pornography. The proof at trial showed that the laptop did not require a password and automatically connected to the internet through a stored wireless password. The laptop contained a common peer-to-peer file sharing program that downloaded child

---

[5] It is not entirely clear from the Defendant's brief exactly which computer or thumb drive he claims were accessible to multiple people: the Hood computer and thumb drive or the Defendant's computer and thumb drive. We will address all in our argument.

pornography onto the computer.  The program was not password protected.  The Sixth Circuit reversed the conviction and reasoned as follows:

> "[a] juror could reasonably infer that [the defendant] owned and occasionally used the laptop from (1) the device's sole username . . . (2) [the detective's] testimony that the laptop "belonged to" [the defendant; and (3) [the federal agent's] testimony about the March 10 visits to the Yahoo! email log-in page. . . [however] without improperly stacking inferences, no juror could infer from such limited evidence of ownership and use that [the defendant] knowingly downloaded, possessed, and distributed the child pornography found on the laptop.  [The defendant] shared his home with two other people, both of whom could access the HP Pavilion laptop's "Jamie" account and Shareaza file-sharing program without entering passwords.

Lowe, 795 F.3d at 523.

Unlike the circumstances described in Lowe, each of the Defendant's convictions of especially aggravated sexual exploitation of a minor was based on forty photographs depicting the victim engaged in digital-vaginal penetration, penile-vaginal penetration, oral sex/fellatio, and other sexually explicit photographs of the victim.[6]  At trial, the victim identified the same forty photographs as representing three separate sexual encounters with the Defendant at her mother's house and in the Defendant's bedroom where the Defendant documented these unlawful acts on his Fujifilm camera "to have something on her."  Although the photographs did not show the Defendant's face, there were other identifiable characteristics of the Defendant including his wedding ring, fingers, distinctive moles on his penis, a watch, pajamas and a bedspread and mini-fridge from the Defendant's bedroom.  An expert in digital forensics determined that the unlawful photographs were taken with the Defendant's Fujifilm camera, and the hash values of thirty-seven of the forty photographs from the Hood thumb drive matched the photographs from the Defendant's thumb drive.  In addition, the forty photographs from the Defendant's thumb drive were contained in a password protected encrypted file that could only be decrypted when connected to the Defendant's computer and hard drive.  To the extent that the Defendant suggests that the victim or the Hoods conspired against him by putting the incriminating thumb drive in his drawer, there was ample evidence showing that the Defendant took extreme measures to prevent anyone from entering his

---

[6] The hash values of each photograph corresponded with each count of especially aggravated sexual exploitation of a minor.  Specifically, the State provided the hash values for seventeen photographs taken on January 14, 2011 (counts one through seventeen), twelve photographs taken on February 4, 2011 (counts eighteen through twenty-nine), and eleven photographs taken on February 8, 2011 (counts thirty through forty).

- 14 -

bedroom without his express permission by placing a deadbolt and keypad on his door. Based on this evidence, we conclude that any rational trier of fact could have found the Defendant guilty of each count of especially aggravated sexual exploitation of a minor as charged in the indictment. Accordingly, the Defendant is not entitled to relief.

**II. Admissibility of Evidence.** The Defendant next argues that the trial court erred in admitting the photographs from the Hood thumb drives in violation of Tennessee Rules of Evidence 1001, 1002, and 1003, as they were not the "best evidence" available because they were found on thumb drives rather than hard drives. In response, the State contends that the trial court properly admitted the thumb drives which "contained original evidence of the images as contemplated by the best evidence rule[.]" The State reasons that the "the best evidence rule does not apply because the [D]efendant is not challenging the content of the images" but is instead "challenging the credibility of the two people who transferred the images onto the [SanDisk] thumb drive and turned it over to the authorities." Upon our review, we agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006). Rule 901, which requires evidence to be authenticated or identified, provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). In addition, Tennessee Rule of Evidence 1002, also known as the best evidence rule, states, "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided[.]"

Here, the gravamen of the Defendant's argument is that the trial court erred in admitting the Hood thumb drive, the content of which led to his arrest, because law enforcement was unable to recover the original unlawful photographs from the hard drive of the Hood computer. At the motion for new trial, defense counsel argued that the inability of the agent to recover the original unlawful photographs from the hard drive of the Hood computer made the evidence "incomplete" and bolstered his theory that Samuel Hood conspired against him. To the degree that we understand the grounds supporting the Defendant's issue, Agent Christian's testimony sufficiently established that the photographs on the SanDisk thumb drive provided to police by Amy and Samuel Hood were the exact same photographs taken by the Defendant's Fujifilm camera, downloaded

onto the Defendant's computers, and transferred onto the Defendant's red Ultra thumb drive found during the search warrant. Although the photographs could not be retrieved from either the Defendant's or the Hood's hard drives, Agent Christian verified through forensic examination and analysis that the photographs existed on the Defendant's hard drive and the Hood hard drive, that the Defendant's red Ultra thumb drive was last inserted into the Hood computer before the Defendant "wiped" it and gave it to Amy Hood, and that the Defendant's red Ultra thumb drive was last plugged into the Defendant's personal computer on the same day the photographs were encrypted. "The best evidence rule is a rule of preference rather than exclusion." Iloube v. Cain, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012). "It does not exclude evidence but rather requires the introduction of the best available form of the evidence." Id. (internal quotation marks and citations omitted). The photographs admitted into evidence and forensically examined by Agent Christian were indeed originals, and thus, the best evidence available. Therefore, we conclude that the trial court properly admitted the Hood thumb drive and the photographs from it. The Defendant is not entitled to relief.

**III. Denial of Motion to Cross-Examine the Victim.** The Defendant next argues that the trial court improperly denied his motion to cross-examine the victim regarding her sexual history because "another male whom the victim had earlier admitted to having consensual sexual relations may have been presented to the jury" to prove an alternative suspect. The State responds that the Defendant presented a sufficient defense and that the trial court properly denied the Defendant's motion. The State asserts that the Defendant failed to explain the relevancy of the victim's sexual history or support his argument with relevant authority. Upon review, we agree with the State.

The Sixth Amendment to the United States Constitution gives an accused the right "to be confronted with the witnesses against him," and this right is given to the States through the Fourteenth Amendment. In addition, the Tennessee Constitution also gives an accused the right "to meet the witnesses face to face." The Tennessee Supreme Court has determined that the confrontation language in the Tennessee Constitution grants a higher right than the similar language in the Sixth Amendment of the United States Constitution. State v. Deuter, 839 S.W.2d 391, 395 (Tenn. 1992). However, the Tennessee Supreme Court subsequently ruled that "we have found no evidence to have been excluded under our state constitution's confrontation clause that was not also excluded under the federal constitution's counterpart." State v. Lewis, 235 S.W.3d 136, 144 (Tenn. 2007).

Tennessee Rule of Evidence 412(c), regarding specific instances of conduct, states:

Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:

(1) Required by the Tennessee or United States Constitution, or

(2) Offered by the defendant on the issue of credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or victim, or

(3) If the sexual behavior was with the accused, on the issue of consent, or

(4) If the sexual behavior was with persons other than the accused,

(i) to rebut or explain scientific or medical evidence, or
(ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters, or
(iii) to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.

Tenn. R. Evid. 412(c).  As with other evidentiary rulings, admissibility of evidence under rape shield rule rests in discretion of the trial court.  State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997).  Where the defendant alleges a violation of his constitutional right to present a defense, we consider the facts of each case carefully and apply the following analysis:  (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.  State v. Brown, 29 S.W.3d 427, 433-34 (Tenn. 2000) (citing Chambers, 410 U.S. at 298-301).

In the Defendant's pre-trial Rule 412 motion, the Defendant cited the victim's statement that she had previously engaged in sexual activity with Stormy Reynolds, an overweight adult white male during the time-frame in the indictment at her mother's house.  The Defendant argued that he should be permitted to cross-examine the victim regarding her sexual history (1) to rebut scientific evidence; specifically, the electronic images generated by the unlawful photographs, and (2) to present the jury with an alternative explanation for the unidentified white male in the unlawful photographs as

- 17 -

part of his defense. At the June 12, 2015 pre-trial hearing, the victim, Amy Hood, Agent Kon, and Agent Christian testified consistently with their testimonies at trial as summarized above. As relevant to this issue, the victim also explained that she had a one-month sexual relationship with then twenty-year-old Stormy Reynolds after she met him in the summer of 2011. The victim denied that Reynolds was the man in the explicit photographs and stated that, to her knowledge, Reynolds had never been to the Defendant's house where some of the photographs were taken. The trial court subsequently denied the Defendant's Rule 412 motion and found that the victim's relationship with Reynolds was irrelevant to the Defendant's case and not admissible under Rule 412. At the motion for new trial, defense counsel argued that the trial court erred in denying the 412 motion but instead claimed that Samuel Hood had a sexual relationship with the victim and was the person in the unlawful photographs. In its oral findings of fact denying the Defendant's motion for new trial, the trial court stated:

> On the evidence about the child's sexual activity, I readily acknowledge that there are times when that evidence is, is highly relevant and needs to come in. That's true in a case, for instance, where consent is an issue. A victim, an alleged victim claiming nonconsent, if he or she is an adult, I mean is over the age of 12 and, consent is actually an issue, the fact that he or she has had sex with a bunch of other people or even potentially one other person beforehand, that, that can be very relevant. But we don't have a consent issue here. We don't have a transmission of sexual disease. It's not an exclusive list, but there has to be some reason for it to come in. And other than to bias the jury against this particular victim, I don't see what it, what the reason was in this particular case. So, I don't think that's a valid ground here.

Upon our review, we conclude that the trial court properly denied the Defendant's motion to cross-examine the victim regarding her sexual history. We agree with the State that the unlawful photographs were not scientific or medical evidence as contemplated by Rule 412(c)(4)(i). Although the metadata (hash values, file paths, etc.) behind the photographs would constitute scientific evidence, the Defendant does not dispute the legitimacy of that evidence. He was attempting to introduce testimony about the victim's sexual history in an effort to show that the unidentified white male in the unlawful photographs was someone else. Based on our review of the record, the Defendant was able to present this defense through his wife and other witnesses. Accordingly, the trial court properly denied the motion, and the Defendant is not entitled to relief.

**CONCLUSION**

Upon review, we affirm the judgments of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE